FRANKLIN,
January,
1840.

NORMAN DAVIS *v.* THOMAS FULLER AND THOMAS FULLER, JR.

The name of a *locus in quo* may be matter of reputation and proved by parol.

Statements or concessions of persons who may be witnesses, though made against their interest, cannot be given in evidence while they are living.

The *opinion* af a mill owner, of the cause which occasioned the water to flow back upon his mill, cannot be given in evidence, especially by other witnesses, in an action between other persons in relation to the obstructions to such mill.

Every proprietor of land has a right to the *natural flow* of a stream across his land, and every interruption of this right, to his injury, by the proprietors either above or below, is a ground of action, however convenient or necessary such interruption may be to the mill of the other proprietor. Prior occupancy confers no exclusive right to a stream, and the right to the natural flow is never lost but by grant, actual or presumptive.

THIS was an action on the case, for obstructing the water which flowed through the plaintiff's land, being a part of lot No. 133, situated on the Missisquoi river, in Enosburgh, by the erection of a dam, by the defendants, across the same stream, below the plaintiff's land, by means of which the water was caused to flow back upon the plaintiff's mill and injure him in the use of it. Plea, not guilty. Issue to the country.

Upon the trial in the county court, the plaintiff offered in evidence a deed from George Woodworth to the plaintiff, dated the 20th day of October, 1832, conveying a part of lot No. 133, describing the land conveyed by metes and bounds ;, which deed was objected to by the defendants, on the ground that it appeared, from an inspection of it, that there had been an alteration as to the number of the lot, and that the plaintiff was bound to show that the alteration was made before the execution of the deed, before it could go to the jury. But the court overruled the objection and admitted the deed.

The plaintiff then introduced James Woodward, as a witness, who testified that the land, described in the above mentioned deed, conveyed the ground upon which the plaintiff's mill was situated and that the witness understood it to be a part of lot called No 133, and, on cross-examination, the witness testified that he formerly owned this lot and had seen three of the corners, but that there were no numbers

FRANKLIN,
January,
1840.

Davis
v.
Fullers.

on those corners; that he had had a deed of the same lot, and the description in the two deeds was the same; that he could not read, nor write, and only knew the description, given in the deeds, by hearing them read to him; that the knowledge which the witness had, that the land on which the plaintiff's mill was erected was a part of lot No. 133, was derived from the description in the deeds, where the land is called No. 133. After this evidence was introduced, the defendants objected, and insisted that the evidence was inadmissible to prove that the land, upon which the plaintiff's mill was located, was a part of lot No. 133, and that the evidence ought not to go to the jury. But the court overruled the objection and admitted the evidence.

The plaintiff then gave evidence tending to prove, that, in the year 1827, and not before, a grist mill was built on the site where the plaintiff's grist mill now stands and that, in 1833, the plaintiff built a new mill on the same site; that the plaintiff, and those under him whom he claimed, had been in the possession of the said premises, using the said water privilege and water flowing in the said stream, for the purposes aforesaid, from 1827 to the present time; that the defendants, in the year 1836, at a short distance below the plaintiff's mill, on the same stream, erected a dam and built a mill on the defendants' land, or land of which they were in possession, and that the dam so built by the defendants caused the water to flow back upon the wheels of the plaintiff's mill, and obstruct and impede him in the use of his mill.

The plaintiff also called James Farnsworth, as a witness, who testified, among other things, that at a certain time, the waste gate of the dam at Hubbard's falls, in Fairfax, was raised or hoisted and that this, upon producing a fall of the water at the gate a given amount, occasioned the water to fall some mile and a half or two miles up the river, in the judgment of the witness, ten or twelve inches.

The plaintiff also introduced, in evidence, the deposition of Simon B. Hazelton, which tended to prove that he worked in a saw mill standing near, and on the same level with, the plaintiff's mill, and that the erection of the dam, by the defendants, below the plaintiff's mill, caused the water to set back and obstruct the plaintiff's mill. Said Farnsworth's testimo-

ny and Hazelton's deposition were given in evidence after the evidence in chief was closed, on the part of the defendahts.

The defendants gave evidence tending to prove that the plaintiff's mill was obstructed by back water, in the winter season, prior to the erection of the defendants' dam, and that this dam did not occasion any injury to the plaintiff's mill, and that the injury, of which the plaintiffs complained, was occasioned by anchor ice, and other ice, adhering to the rocks in the river between the defendants' dam and the plaintiff's mill.

The defendants offered to give in evidence the declarations of the persons who owned and occupied the mill, on the same site, before the plaintiff came into possession and built his mill, and while they were in the use and possession of the former mill and before the defendants' dam was built, that their grist mill, was, at certain seasons of the year, troubled with back water, and that the cause of the obstruction was the accumulation of anchor ice in the river on the rocks below the plaintiff's mill, which occasioned the water to set back upon the plaintiff's mill. This evidence was objected to by the plaintiff and excluded by the court.

On the trial of the cause, and as evidence in chief, the defendants were permitted to give evidence tending to prove that the saw mill spoken of in Hazelton's deposition was situated near the plaintiff's grist mill, and that the water which supplied it was taken from the same pond and level that carried the grist mill, and that the saw mill wheel was about on the same level with the grist mill wheel, and that the water which passed from the saw mill wheel flowed down near the tail of the plaintiff's grist mill, when it mingled with the water which came from the grist mill and then passed off, and that prior to the building of the defendants' dam, this saw mill was troubled and impeded in its operation by the water setting back upon the wheel, in certain seasons of the year, occasioned by obstructions formed by anchor ice and other ice in the stream below.

Evidence was given, by the plaintiff, tending to disprove this obstruction to the saw mill. After the testimony in

chief was closed in the cause, the defendants, for the purpose of impeaching James Farnsworth, who had been called as a witness, called a witness and offered to prove by said witness that at some other time he was at the dam at Hubbard's falls, in Fairfax, and the gate was hoisted or raised at the dam, and that, at a certain point between the gate and the point in the river where said Farnsworth had stated that he had taken observations, as to the fall of the water, the water did not fall in the same proportion with the fall of the water at the dam, as stated in the testimony of James Farnsworth, but much less. This testimony was objected to by the plaintiff, and the court excluded it for the purpose for which it was offered.

The defendants, also, for the purpose of impeaching the testimony of Simon B. Hazelton, offered to prove that he had frequently said, while he was tending the said saw mill, that the saw mill was troubled with back water, occasioned by the accummulation of ice in the stream. This was objected to by the plaintiff's counsel, and was excluded by the court.

The counsel for the defendant requested the court to charge the jury, that, if the injury to the plaintiff's mill was not primarily occasioned by the defendants' dam, but was occasioned by the accumulation of anchor ice and other ice formed in consequence of the erection of the defendants' dam, the defendants' were not responsible to the plaintiff for any injury arising to the plaintiff from the back water that may have been occasioned by those secondary causes, and that if the plaintiff, and those under whom he claimed, had not been fifteen years in the exclusive use of his mill and mill privilege, before the erection of the defendants' dam, the plaintiff obtained no advantage over the defendants by prior occupacy, and that, as the plaintiff had not shown any title to the premises upon which the mill was erected, but was in possession for a term less than fifteen years, both of the parties, for the purposes of this trial, were to be deemed the several owners of the premises upon which their respective mills were located, and had the same rights as if they had taken possession of and commenced using their respective mill privileges at one and the same time, and that if from the want of water, want of fall or any other circum-

stances, both could not be used and enjoyed to the fullest extent, without injury to the one or the other, then neither had the exclusive right, but that each had a right to use his own privilege in such a manner as to do as little injury as was consistent with a fair and reasonable use of the water, and that, in this case, if the jury found the defendants had a good mill privilege below that of the plaintiff, which he could not use without obstructing the plaintiff's mill, and the defendants had put no obstruction in the stream but what was necessary for a fair and reasonable use of their own mill privilege, the plaintiff could not recover, though such obstruction and use might occasion some injury to the plaintiff in the enjoyment of his mill above.

But the court, among other things, charged the jury, that each proprietor through whose lands a stream of water may flow, has a right to use and apply the water, while it is passing over his own lands, to domestic, agricultural and manufacturing purposes, provided he uses it in a reasonable manner, and in such a way as not to injure the rights of another, and, in this case, the plaintiff, though he and the persons under whom he claimed had been in the use and possession of their mill and water privilege for a period less than fifteen years, at the time the injury complained of, had a right not only to have the water flow through his own land, but also through the lands of the defendants without obstruction, to his prejudice, and if the jury found that the defendants had, subsequently to the erection of the plaintiff's mill and the use of his privilege above the defendants' mill, erected a dam across the stream below the plaintiff's mill, on their own land and for the purpose of erecting a mill on the defendants' own privilege, and notwithstanding it was no greater or higher than was necessary for the enjoyment of the defendants' mill privilege below, still, if they should find, from the evidence, that the dam, which the defendants had erected across the stream below, was the primary cause of the obstruction of the water and had caused it to flow back upon the lands of the plaintiff and to impede and obstruct him in the use of his mill, it was a material injury for which the plaintiff was entitled to recover the actual damage which the jury should find he had sustained, by reason of such obstruction, and that it could make no difference though the jury

OF THE STATE OF VERMONT.                    183

FRANKLIN,
January,
1840.

Davis
v.
Fullers.

should find that secondary causes combined with the primary cause (to wit, the dam) in producing the obstruction, or in increasing it, provided they should find these secondary causes were the effects or results of the primary cause. In either event, the defendants were liable for the actual damages which the jury should find the plaintiff had sustained.

So, if the jury should find that the plaintiff had been, prior to the erection of the defendants' dam, obstructed in the use of his mill by the water setting back upon his wheels and would have continued to have been so obstructed without the erection of the defendants' dam; yet, still, if they found these obstructions in the use of the mill to have been increased since the erection of the dam, and this increase had been the consequence of the erection of the dam, by the defendants, the plaintiff was entitled to recover such actual damage as he had sustained by means of such increase of obstruction.

The jury returned a verdict for the plaintiff. The defendants excepted to the decisions of the court and to that portion of the charge above stated.

*Smith & Aldis and Smalley & Adams*, for defendant.

I. The deed offered by the plaintiff had been altered in a material part, viz; in the number of the lot, which was a part of the description of the premises conveyed.

Where a deed has been altered in a material part and the alteration was not noted at the time of its execution, it is the duty of the party producing it to show that the alteration was made before its execution or give some satisfactory explanation. *Jackson* v. *Osborne*, 2 Wend. 555. 1 Phil. Ev. 405. Bull. N. P. 255.

II. The declaration alleges that the plaintiff was possessed of a certain tract of land and a mill site, situated on lot No. 133 on the banks of Missisquoi river, in Enosburgh, and a certain grist-mill thereon standing.

The plaintiff must prove, as alledged in his declaration, that the mill is on No. 133.

1. The deed to the plaintiff, even if it had not been altered, would not have proved the number to have been 133. It amounts to nothing more than a statement of the grantor, at the time he owned the land, that he *supposed* it was a part of No. 133, for he describes the land conveyed by metes and bounds and does not rely upon

the number. We have no opportunity to test the grantor's means of knowledge. The declarations of the grantor are not admissible to prove that fact.

2. The witness, James Woodward, could not read nor write. He had owned the land and had had a deed of it and all his knowledge of the numder of the lot is derived from having heard the deed read, where the lot is called No. 133. His having heard the last deed read is no evidence that the premises are a part of lot No. 133. That deed had already been read to the jury and they had heard it as well as he.

3. All this testimony was inadmissible to prove the number of the lot. The lot had been surveyed and numbered and there was a map of the town, in the records, and this is the legal proof of the number of a lot. The plaintiff should have produced some one who had seen the numbers on the trees; if they were gone, then it should be proved by the plan of the town.

III. The declarations of those under whom the plaintiff claimed and who owned and occupied the mill on the same site, before the plaintiff came into possession, and while they were in the use and possession of the same and before the defendants' dam was built, that the grist mill was troubled with backwater and that the cause was the accumulation of anchor ice on the rocks below plaintiff's mill, were admissible. Such declarations were against the interest of the persons who made them and when accompanied by the ownership and use of the premises, are in the nature of acts done by the party, or at least declarations accompanying such acts. They are not affected by the credibility of the person making them. They are, in fact, most convincing proof of the truth of the facts they relate to. Such declarations are analogous to the declarations of tenants while in the occupation of land, as to the extent and mode of occupation. 8 Vt. R. 356. 3 Cond. Ch. R. 31, in note.

IV. The testimony to impeach Hazelton was admissible, as proving declarations made by him which, *necessarily*, contradicted his testimony. His deposition being *ex parte*, he could not be inquired of as to his declarations.

V. It appears, from the case, that the defendants have a natural mill privilege; that for the reasonable enjoyment of this privilege, the dam they have erected is necessary and that the dam is not raised any higher than is necessary for

such reasonable enjoyment. Under such circumstances they have a right to have the dam as it is, although at times it may interfere with the plaintiff's use of his mill and raise the water on his premises. Cases frequently occur, on the small streams in this State, where the interest of mill owners are conflicting and where the application of the common law rule, instead of relieving, will only increase the embarrassment. In such cases it should be left for a jury to determine whether the use made of the natural privilege is a reasonable use or not. The reasonable use of the numerous water falls in our State is to be encouraged. Their improvement adds to the comfort and wealth of our people. Competition in the use of them is not less desirable, and no decisions ought to be made by our courts, that will tend to restrict and embarrass the use of them.

Artificial legal rules, on such subjects, are to be avoided as they are always difficult of practical application. Such ought to be and is the law of Vermont. The case of *Martin* v. *Bigelow*, reported in 2 Aik. 184, is directly in point.

The decision of the court, in that case, was unanimous and while it recognized the common law, as contended for by the plaintiff, it declared it inapplicable to the wants and situation of this State. The same rule prevails in New York. 15 Johns. R. 215. The common law is abrogated in Massachusetts, for the doctrine of prior occupancy is inconsistent with it, and a resort to that doctrine is unnecessary, if the common law prevails. It is believed that Connecticut is the only State that has, as yet, adopted the rule of the common law upon this subject. *Merritt* v. *Brinkerhoof*, 17 Johns. 320. *Palmer* v. *Mulligan*, 3 Caines' R. 307.

VI. There is still another and a very important question arising in this case. The court charged the jury, that if the defendants' dam did not, of itself, cause the water to flow back upon the plaintiff's premises, but caused anchor ice to form and accumulate in the river, between the defendants' dam and plaintiff's mill, by which, as a secondary cause, the water was thrown back on the plaintiff's mill, then the plaintiff was entitled to recover. The defendants have only exercised their indisputable legal rights in building their dam, and in all ordinary times this exercise of their rights would not operate at all to the plaintiff's injury. The occurrence of the second

cause (the formation of anchor ice) could not have been foreseen. It is not the necessary and uniform result of the building of the dam. It arises from various causes and is more or less injurious according to the state of the weather, and other causes, some of which are known and others unknown. For an injury so remotely connected with defendants' acts and which is not of ordinary and uniform occurrence, but is varied from time to time by causes existing in nature, beyond the control of the defendants, they ought not to be made responsible.

Upon this point the charge of the court was defective, in not pointing out the difference between those secondary causes, which are ordinary in their occurrence and might have been foreseen, and those which are unusual and extraordinary. The defendants ought to be responsible for those secondary causes, springing from their acts, which ordinary prudence and foresight could, and for those secondary causes which could not, be foreseen, but which are, usually the necessary, or ordinary results of their acts; but for the results of those secondary causes, which are not the necessary or ordinary effects of the first cause, they ought not to be responsible. Whether the formation of anchor ice was of the ordinary kind or not was for the jury to weigh; but the court did not so charge, but made the defendants responsible for the effects of all secondary causes.

*S. S. Brown and H. R. Beardsley*, for plaintiff.

I. The testimony of James Woodward was properly admitted, because,—

1. It went clearly to locate the mill, and for that purpose was proper.

2. It tended to prove that the land described in the deed was a part of lot number 133. This fact might well be established by reputation, inasmuch as the number of the lot was mere matter of description and not necessary to be proved in order to establish a title.

II. The evidence offered on the part of the defendants, to prove the declaration of persons in possession of the mill standing on the same spot, but not the same mill, as to back water and the causes, was properly rejected by the court, because,—

1. These persons could themselves have been witnesses

FRANLIN,
January,
1840.

Davis
v.
Fullers.

and their declarations, when not under oath, are not the best evidence the case admitted of.

2. The injury, complained of, was not an injury to the land, but to the mill, and if the declarations of persons in possession could have been admitted at all, it must have been the declarations of persons in possession of the same mill to which the injury was done, and not of any other mill standing upon the same place.

3. The declarations, offered to be proved, were made before the defendants' dam was erected.

4. The declarations of persons in possession, offered to be proved, were declarations of causes and effects having no connexion with the right of possession or the extent of their claim.

5. The rule that admits a party to prove the declarations of persons in possession, as to his right of possession and the extent of his claim, is among the exceptions to the general rule and ought not to be extended.

III. The testimony offered to impeach Joseph Farnsworth was properly rejected.

1. Because it was offered after the evidence in chief was closed and went to another and different experiment than the one sworn to by Farnsworth.

2. Because the testimony offered had no tendency to impeach Farnsworth, as a witness, but a remote tendency to prove the inaccuracy of the experiment sworn to by him. The defendants might have proved an experiment made on any other stream with the same propriety.

IV. The evidence offered to impeach the testimony of Hazelton was properly rejected.

1. Because Hazelton, in his deposition, had said nothing about the saw mill, only that he had tended it. He stated his knowledge of the effect of back water on the grist mill, and this the defendants did not offer to disprove. Proving that the witness said the saw mill was troubled with back water, had no tendency to impeach his statement about the grist mill.

V. The objections to the principles stated by the judge in the charge, are not well founded.

The jury found that the dam erected by the defendants was the primary cause of the injury complained of. Now

though there might have been a secondary cause intervening between the first cause and the effect, yet the right to recover would be the same. In all these cases the injury is not direct but consequential. The obstruction is the cause, the setting back of the water the effect, and though the obstruction produces an effect which becomes an intermediate cause, yet, if this intermediate cause would not exist if the obstruction was removed, then the act of placing the obstruction in the stream causes the injury and the person who placed it there must be liable for the consequences.

The charge of the judge, that prior occupancy was sufficient to entitle the plaintiff to recover, was in accordance with the doctrines of the common law and ought to be adopted in this state. 17 Mass. R. 289. 7 Pick. 198. *Martin* v. *Bigelow*, 2 Aik. R. 184. 3 Kent's Com. 439, 445. *Hull* v. *Pratt*, 4 Vt. R. 199.

In the case of *Hull* v. *Fuller*, the court clearly adopt the doctrine of the English law. That case turned on the prior possession of the plaintiff.

The case of *Watson* v. *Alden*, 8 Mass. R. 136, has no analogy to the present case. That case has been much spoken of in subsequent cases and was virtually overruled by the case of *Anthony* v. *Lapham*, 5 Pick. R. 175.

In the state of New York a class of cases will be found corresponding with the case of *Martin* v. *Bigelow*, above cited. But the courts of that state have been continually receding from the grounds first taken upon the subject. *Stiles* v. *Hokers*, 7 Cowen's R. 266.

In Connecticut the courts originally took the same grounds taken by our court in the case of *Martin* v. *Bigelow*. By examining the decisions in that state, it will be seen that the courts there are falling back upon the principles of the common law. 9 Conn. R. 162. 10 do. 213.

The opinion of the court was delivered by

COLLAMER, J.—There is much diversity, in the authorities, in relation to apparent alterations in written instruments. By some it is considered such alterations are to be presumed to have been made by the holder after delivery, and that unless he rebuts this presumption, and shows it was made before delivery, or by mutual consent, it destroys the paper. This

seems to *presume* the holder is guilty of forgery and has destroyed his own security. Other law writers consider that such alterations are to be presumed made before delivery or by consent, until the contrary is shown. But, in this case, we think the question does not arise, as we find, on inspection, that there was no such obvious alteration that the court could, consistently with any course of decisions, have excluded the deed from the jury. The very fact of there being any alteration was quite too doubtful to be assumed by the court.

The plaintiff alleged that the injury done him was on lot No. 133. This number was not a matter in issue, that is, the plaintiff did not claim to own No. 133 ; neither does it seem to have been important as a matter of identity, as there was no doubt where the plaintiff's mill in fact was. It was a part, and entirely a useless part, of the description of the *locus in quo,* for the plaintiff's land was otherwise described in his deed with sufficient precision. But, as it was *matter of description,* it must be proved. Reputation was, however, sufficient. That the lot had been *so called and treated* was enough. Therefore, Woodward's testimony, that he bought, held and sold it by that name, was clearly admissible.

Among the few exceptions to the rule of law, that the statements of persons, out of court, who might be witnesses in, are not permitted to be proved, is this—the statements of tenants or occupants of land, of the extent or nature of their tenancy. But it is not true that any statement which a man may have made, which was against his interest, is admissible in evidence, because he cannot be presumed to have done it falsely. The entries in physicians' and stewards' books, made against their interest, have never been permitted to be proved while they, the physicians or stewards, were still living. Here the defendants offered to show that persons, who owned mills on this dam, had said they had been troubled with back water in the winter, and that it was owing to anchor ice on the falls below. No proof was offered that these persons were deceased. This did not fall within either of the above exceptions and was inadmissible. Besides, it was a mere matter of opinion, on the point on trial, and they could hardly have been permitted to testify to it in court, much less could their opinions on this point be put in evidence, without the sanctions of legal obligation.

The case does not contain any sufficient statement to present to this court the question, debated by the counsel, as to the attempt to impeach Hazelton.   The case shows it was offered to be proved he had said his saw mill had been obstructed by ice below, but the case does not show that when *his* mill was obstructed the plaintiff's must be also.

This brings us to the main question in the case, that is, what are the respective *rights* of these parties.   The jury, under the charge of the court, have found the following facts. The plaintiff holds a certain lot of land, across which flows a river on which he has a grist mill.   The defendants own land on the stream, below, where they have erected a dam to carry a saw mill, but have erected it no higher than is necessary for that purpose.   This dam occasions accumulations of ice, which, at times, flows the water back on to the plaintiff's land, and obstructs his mill, to his injury.   There has been no grant between the parties and no user for any such lapse of time as that any grant could be thereby presumed.   What are the rights of these riparian proprietors?

It has been supposed, and at times said, in our courts, that, by the first appropriation of the stream to the carrying of a mill, some exclusive right was obtained, and that the rights of proprietors of land to the natural flow of the water across their land must be qualified, or accommodated, or, in some degree, give way to the convenient and prudent use of that water by mill owners above and below.   The use of water in ordinary streams, running over lands which are upon the private property of individuals, has been attempted to be placed on the same principle as using the water of the sea, or of navigable rivers, or the use of the air ; a mere right derived from the appropriation from the common stock of the element.   This, however, is a wrong view of the subject.   The owner of land has rights to the use of a private stream, running over his land, peculiar to himself as owner of the land, not derived from occupancy or appropriation, and not common to the whole community.   It is the right to the natural flow of the stream. Of this right he cannot be deprived by the mere use or appropriation by another, but only by grant or by the use or occupancy of another for such a length of time as that therefrom a grant may be presumed.   This subject has recently undergone much judicial examination.   In the laborious re-

search of the learned Judge Cowen, lately given to the profession in his notes to Phillips' Evidence, 2 Vol. 378, on this subject, he says :—" It is not to be disguised that the doctrine " of exclusive right, founded on mere priority of appropria- " tion, received, at one time, strong countenance from dicta " of learned judges, if not by direct adjudication ;"—" and " in the anxiety to maintain the concurrent erection and use " of mills, the claim to the natural flow seemed to rest on very " uncertain ground:" and he cites 15 Johns. 215: 17 do. 306. 3 Caines' R. 307.   2 Aik. R. 184.   The same authorities on which the defendants rely.

In England, in the recent case *Wright* v. *Hammond*, before the Vice Chancellor, in 1831 ; and in the case *Mason* v. *Hill*, before the King's Bench, in 1832, the subject underwent judicial investigation.   (3 Barn. and Ald. 304.   23 Com. Law R. 77.)   Says Lord Tenterden, adopting the language of the Master of the Rolls, " without the consent of the proprietors who may be affected by his operations, no proprietor can either diminish the quantity of water which would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above.   Every proprietor, who claims either to throw the water back above or to diminish the quantity which is to descend below,must prove an actual grant or licence from the proprietors affected,or an uninterrupted enjoyment of twenty years."   "An action will lie at any time, within twenty years, when injury happens to arise in consequence of a new purpose of the party to avail himself of his common right."   In New York, in the case (10 Wendell, 260.) the same doctrine is settled.   In Massachusetts the same doctrine is now fully settled. 9 Pick. R. 59. In Connecticut this is also fully sustained in the case *King et al,* v. *Tiffany*, 9 Conn. R. 162.   And, in these authorities, the courts repudiate the notion that the *amount* of the damage alters the principle.   In this State, the case of *Johns* v. *Stevens & Brewster*, 3 Vt. R. 308,-recognizes the same law.   The result of all these authorities, then, is, that every owner of land, over which a stream flows, has the right to the natural flow of that stream ; that he can never be deprived of this right but by grant, actual or presumptive.   Whenever this right is encroached upon by obstructions or perversions, above or below, and actual injury ensues, to *any* material

amount, an action accrues, however valuable or convenient the use of such obstructions may be to him who erected them. Judge Story says, in the case *Tyler* v. *Wilkinson,* " mere priority of appropriation of running water, confers no exclusive use." And again, " the true test of the principle and extent of the use, is, whether it is to the injury of the other proprietors or not." The notion now insisted on for the defendants, that a man who has *a mill privilege* may use it, if he does no wanton or unnecessary injury to another, is entirely without foundation. No man can be said to have a *mill privilege* which cannot be used without injury to others. The plaintiff acquired no right by the first erection of his mill, but he had a right to the natural flow of the stream. The defendants, by their dam, interrupted that right. The plaintiff was thereby injured, and for this could sustain his action.

Judgment affirmed.